## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                  Crim. No. 16-01093 MV

ADRIAN TRAMMER,

      Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant Adrian Trammer's Motion to Suppress Evidence Seized as a Result of his Unlawful Arrest, filed September 9, 2018 [Doc. 48]. The government filed a Response on October 3, 2018 [Doc. 54], and Mr. Trammer filed a Reply on October 17, 2018 [Doc. 57]. The Court held an evidentiary hearing on February 8, 2019. Having reviewed the briefs, testimony, exhibits, and relevant law, for the reasons set forth below, the Court **GRANTS** the Motion to Suppress.

### PROCEDURAL BACKGROUND

On March 23, 2016, Mr. Trammer was charged in a three-count Indictment [Doc. 5], with Count 1 of Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), Count 2 of Interference with Interstate Commerce by Robbery and Violence, and Aiding and Abetting, in violation of 18 U.S.C. §§ 1951(a) and 2, and Count 3 of Using, Carrying, and Discharging a Firearm During and in Relation to a Crime of Violence, and Possessing and Discharging a Firearm in Furtherance of Such Crime, and Aiding and Abetting, in violation of 18 U.S.C. §§ 924(c) and 2. On September 9, 2018, he filed the instant Motion to Suppress [Doc. 48]. The government filed a Response on October 3, 2018 [Doc. 54], and Mr. Trammer filed a Reply on October 17, 2018 [Doc. 57]. The Court held an evidentiary hearing on

February 8, 2019, during which it heard testimony from Detective Stephen Walsh, Detective Eric Endzel, Detective Denise Myers, and Summer Salazar.

## FACTUAL BACKGROUND

This case concerns the warrantless arrest of Adrian Trammer made by law enforcement inside Mr. Trammer's motel room. The following represents the Court's findings of fact, based on the parties' briefing, the testimony of witnesses at the evidentiary hearing on February 8, 2019, and the exhibits.

In November of 2015, Detective Denise Myers of the Albuquerque Police Department (APD) was investigating a series of robberies of cell phone stores. Hearing Tr. (Tr.) at 98. On November 17, 2015, Detective Myers received a telephone call from Agent Brandon Garcia with the Bureau of Alcohol Tobacco and Firearms, who alerted her that he had a source of information who provided a tip regarding the two men who had committed the cell phone store robberies. *Id*. at 99. The informant's tip indicated that the two men who claimed to have committed the robberies were Perlyn Perine and Adrian Clay "TC" Trammer. *Id*.; Gov. Ex. 1 at 4–5. The informant stated that the men asked him if he wanted to purchase a cell phone from them. Gov. Ex. 1 at 5.

That same evening and continuing into the next morning, Detective Myers was able to review photographs of Mr. Perine and Mr. Trammer through "alternative investigative databases," which matched both the descriptions of the robbery offenders in the listed cases as well as the offenders seen in the surveillance videos of the listed robberies. *Id*.; Tr. at 99–101. Detective Myers testified that on November 17, prior to the Sprint store robbery at issue in this case, she was aware that Mr. Trammer's nickname was "TC". *Id*. She also testified that she reviewed photographs of him, which she was able to compare to descriptions of the robber and surveillance videos from the previous cell phone store robberies. *Id*. She testified that at that point in her

investigation she had sufficient information such that she considered Mr. Perine and Mr. Trammer suspects in the robberies. *Id.* at 101. Sometime thereafter, Detective Myers contacted the Investigative Support Unit (ISU), whose main purpose is to apprehend suspects or "known offenders." *Id.* at 102–04. Her intent was to brief the ISU detectives in her office, which generally would entail going over pictures and locations as well as "a general plan of what's going to happen as far as if we can get them into custody." *Id.* at 104. Detective Myers testified that prior to the Sprint store robbery, her plan was to brief ISU so that they could apprehend Mr. Perine and Mr. Trammer. *Id.* at 104–05.

However, that briefing did not take place due to Detective Myers receiving a call on the morning of November 18, 2015 regarding a surveillance video showing two males robbing a cell phone store at gunpoint. *Id.* at 78. According to Detective Walsh, surveillance video from the Sprint store located at 2520 Juan Tabo Boulevard in Albuquerque revealed two men entering the store, taking the clerks into a back room, and tying them up. *Id.* at 8. The men were armed and at one point, one of the men inadvertently shot the other in the back. *Id.* The men took cell phones from the store as well as an iPad belonging to one of the employees. *Id.* Detective Myers reviewed the surveillance video from the robbery and determined that the men in the surveillance video resembled the men she had already been investigating. *Id.* at 79–80.

Officers used GPS monitoring on the stolen iPad to track it to the area of Hotel Circle and Lomas, at which time plain-clothed detectives were deployed to the area of the Freeway Inn. *Id.* at 80. Officers observed a man, later identified as Mr. Perine, exiting a room and walking down the stairs with a suitcase. *Id.* at 81. He was detained, and Detective Myers subsequently arrived at the scene and was present when one of the victims from the earlier robbery identified Mr. Perine

as one of the offenders. *Id*. at 82. Because of an apparent gunshot wound to his backside, Mr. Perine was transported to the hospital by ambulance. *Id*. at 82–83.

At this time, Detective Myers returned to her office to continue researching the second offender and learned that Adrian Trammer also went by TC Trammer.[1] *Id*. at 83. At approximately 1:30 or 2:00 p.m., she again contacted ISU to advise them that she needed help "locating the second offender." *Id*. Her intent was to have ISU take Mr. Trammer into custody and bring him to the main APD station. *Id*. at 111. Detective Endzel, as part of the ISU team, testified that at the time they were provided the information identifying Mr. Trammer, they were "under the impression that [they] had probable cause to arrest Mr. Trammer." *Id*. at 69. He also testified that the initial purpose of his involvement in this incident, beginning by early afternoon on November 18, was to locate and arrest Mr. Trammer. *Id*. at 59. From the beginning of their investigation, ISU detectives were given specific names, descriptions, and identifiers as well as photographs of the offenders. *Id*. at 45, 60.

At approximately 4:00 p.m., two women exited one of the rooms that officers were surveilling at the Freeway Inn and got into a gold minivan. *Id*. at 61–63. When they started driving, the signal that was begin emitted from the iPad's GPS tracking device also began to move. *Id*. Detective Endzel followed the van and conducted a stop, but once he determined that Mr. Trammer was not in the van, he returned to the Freeway Inn. *Id*. At that point, the officers surveilling the rooms at the Freeway Inn noticed a man matching Mr. Trammer's description moving items out of one of the rooms on which they had been focusing. *Id*. at 63–64. Officers contacted the man, Terry Allen, who was a maintenance worker at the Freeway Inn. *Id*. at 64. Detective Endzel asked Mr. Allen about Mr. Trammer. *Id*. at 65–66. Mr Allen stated that Mr.

---

[1] However, she also testified that on November 17, prior to the Sprint store robbery even happening, she was aware that Adrian Trammer's nickname was TC. *Id*. at 99.

Trammer had been with a woman in a white PT cruiser. *Id*. He also made statements that confirmed Detective Endzel's belief that Mr. Trammer had been involved in the Sprint store robbery earlier that day. *Id*. Mr. Allen stated that he did not want any part of what was going on with the other people that were staying with him. *Id*. at 87. Mr. Allen was then transported to the police station for an interview which took place around 5:30 p.m., approximately the same time as the interview with the second suspect, Mr. Perine. *Id*. at 88-90.

Detective Endzel recalled seeing a vehicle similar to a PT Cruiser, a white Chevrolet HHR, at a nearby motel, the Amberly Suites. *Id*. It was at that point, between approximately 4:15 and 5:00 p.m. that the ISU officers changed their location to begin surveillance at the Amberly Suites, watching the motel and the HHR. *Id*. at 66, 70.

Detective Endzel testified that they were surveilling the Amberly Suites for a minimum of three hours prior to making contact with any individuals at that location. *Id*. At no point during this time was there any attempt to procure an arrest warrant for Mr. Trammer. After several hours of surveillance, the detectives noticed a woman sitting in the car who began unloading bags from the vehicle and taking them to room 164 of the motel. Gov. Ex. 1 at 5. It appeared that she was cleaning the vehicle, moving items and going back to a specific room. *Id*. at 50. Detectives eventually contacted the woman, Jessica Bowles, around 8:00 p.m. in the lobby of the motel. Tr. at 50, 59. Upon questioning, Ms. Bowles first indicated that she did not know who the officers were talking about, but then confirmed that TC or Mr. Trammer was in the motel room. *Id*. at 50, 66.

Detective Walsh testified that because Ms. Bowles was initially untruthful and then changed her statement, he believed that Mr. Trammer "might be inside," but was not "100 percent sure." *Id*. at 51. Detective Endzel testified that based on the fact that Ms. Bowles was initially

untruthful, they were uncertain of whether Mr. Trammer was in the room, and because of the time delay and the potential danger to officers and the public if they were to wait for a warrant to be issued, he did not believe that they would be able to obtain a search warrant. *Id*. at 72–73. Because detectives were aware that at least one round was fired during the robbery earlier, they suspected that Mr. Trammer might be armed. *Id*. at 52. Detective Endzel also testified that they knew there was a possibility that evidence was being moved or hidden either in the vehicle or the room. *Id*. To that end, they had knowledge that Mr. Perine had been arrested earlier that day and that he had a bag with him at the time that officers contacted him. *Id*. at 52–53.

Shortly thereafter, the detectives approached room 164 and knocked on the door without announcing that they were police. *Id*. at 67. Ms. Salazar testified that the officers had their arms drawn at that time. *Id*. at 116. Another individual answered the door, at which point Detective Endzel positively identified Mr. Trammer who was asleep on the bed, laying above the covers. *Id*. at 29, 55, 116, 130. Detective Endzel testified that Mr. Trammer turned and looked towards the door, at which point he was able to identify him as the person about whom they had been provided information earlier. *Id*. at 17. He also testified that Mr. Trammer concealed his hands, and because they believed he was previously armed, they believed a weapon may have been close. *Id*. at 56. At that point, officers entered the room without a warrant and arrested him. *Id*. at 29. Officers stated that Mr. Trammer did not comply with their commands and concealed his hands. *Id*. at 57. However, Detective Walsh testified that Mr. Trammer appeared to be sleeping, and Ms. Salazar also testified that Mr. Trammer was sleeping above the covers. *Id*. at 29, 116, 130.

The arrest took place at approximately 8:00 p.m. *Id*. at 59. Detective Myers testified that she did not feel that she had enough information to write an arrest warrant prior to the time that the officers "did a knock and talk on the room and identified [Mr. Trammer]." *Id*. at 93. She stated

that she did not feel comfortable connecting TC to Adrian Trammer until that point. *Id.* She had

previously been working on drafting search warrants for the first two motel rooms. *Id.* at 94.

Subsequent to Mr. Trammer's arrest, she prepared the search warrant for the motel where Mr.

Trammer was ultimately located. *Id.* at 95. All search warrants were approved telephonically by

a judge on November 18, 2015 at approximately 11:45 p.m. *Id.* Detective Myers testified that

once a warrant is approved by the DA's office, she calls the on-call judge, and the judge is able to

use DocuSign to approve the warrant. *Id.* at 95–96. They are then required to obtain a physical

signature from the judge within 24 hours of the telephonically obtained warrant. *Id.* at 96. The

search warrant authorized a nighttime search of room 164 at the Ramada Inn.[2] Gov. Ex. 1 at 1.

## LEGAL STANDARD

The Fourth Amendment protects individuals' right to be free from unreasonable searches

and seizures, and in particular, protects against the physical entry of the home. *New York v. Payton*,

445 U.S. 573, 584–86 (1980). Searches and seizures in a home without a warrant are

presumptively unreasonable. *Id.* at 586. The Fourth Amendment prohibits police officers from

making a "warrantless and nonconsensual entry into a suspect's home in order to make a routine

felony arrest." *Id.* at 576. Officers may lawfully enter a home without consent and conduct a

warrantless arrest only where both probable cause and exigent circumstances exist. *United States

v. Reeves*, 524 F.3d 1161, 1169 (10th Cir. 2008) (quoting *Payton*, 445 U.S. at 590). The

government bears the burden of showing that the officers had probable cause and that exigent

circumstances existed such that the warrantless entry was necessary. *United States v. Chavez*, 812

F.3d 1295, 1298 (10th Cir. 1987).

---

[2] It was indicated during the hearing that many of the hotels at Hotel Circle frequently change names.

For purposes of Fourth Amendment protection, a motel room where an individual is staying is treated as a home would be treated. *See Reeves*, 524 F.3d at 1164-65; *see also United States v. Aguilar*, No. CR 10-396-RB, 2010 WL 11622980, at *3 (D.N.M. June 24, 2010) (the court treated a motel room as the defendant's domicile for Fourth Amendment purposes, relying on the Supreme Court's decision in *Minnesota v. Olson*, 495 U.S. 91, 98-99 (1990), holding that overnight visitors have a reasonable expectation of privacy in their temporary shelter); *United States v. Wicks*, 995 F.2d 964, 969 (10th Cir. 1993) ("A motel room may be considered a "dwelling" for purposes of the validity of a warrantless arrest.").

### i.    Probable Cause

Probable cause exists where, "under the totality of the circumstances there is a reasonable probability that a crime is being committed." *United States v. Traxler*, 477 F.3d 1234, 1247 (10th Cir. 2007) (citing *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999)). The totality of the circumstances test looks at whether the facts on the whole as observed by law enforcement "indicate a fair probability" that criminal activity is taking or has taken place. *Id*. (quoting *United States v. Concepcion-Ledesma*, 447 F.3d 1307, 1316 (10th Cir. 2006)). Under this test, no single factor or piece of information is determinative. *Id*. (citing *United States v. Johnson*, 364 F.3d 1185, 1192 (10th Cir. 2004)).

### ii.    Exigent Circumstances

In *Payton*, the Supreme Court held that "[a]bsent exigent circumstances, that threshold [of the house] may not reasonably be crossed without a warrant." *Id*. at 590. Whether an action is reasonable depends on whether the circumstances, viewed through an objective lens, justify the action. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006); *see also United States v. Patino*, 830 F.2d 1413, 1415 (7th Cir. 1987) ("an objective standard governs the reasonableness of law

enforcement officials' belief that exigent circumstances have arisen") (citation omitted).   The

government bears the burden of proving that there was an exigency.  *United States v. Wicks*, 995

F.2d 964, 970 (10th Cir. 1993).  "The existence of exigent circumstances is a mixed question of

law and fact."  *United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006) (quoting *United States*

*v. Anderson*, 981 F.2d 1560, 1567 (10th Cir. 1992).  However, there is "no absolute test" for

whether a valid exigency exists because that determination will turn on the unique facts of each

case.  *Wicks*, 995 F.2d at 970.

Courts have recognized several types of exigent circumstances including a threat to officer

safety, an ongoing "hot pursuit" of a fleeing suspect, or the possible imminent destruction or loss

of evidence.  *United States v. Martin*, 613 F.3d 1295, 1299 (10th Cir. 2010) (citing *Georgia v.*

*Randolph*, 547 U.S. 103, 116 n. 6 (2006)); *see also Olsen*, 485 U.S. at 100 (where the Supreme

Court noted that the Minnesota Supreme Court applied "essentially the correct standard" for

exigent circumstances by recognizing exceptions for warrantless intrusions for hot pursuit of a

fleeing felon, imminent destruction of evidence, the need to prevent a suspect's escape, or the risk

of danger to the police or other persons inside or outside the dwelling).

The Tenth Circuit has previously applied the exigent circumstances exception to the

warrant requirement where there was a significant risk to officer safety or the safety of the public.

*Id*.  Under this exception, the Tenth Circuit has employed a two-part test: (1) whether the officers

have an objectively reasonable basis to believe there is an immediate need to protect the lives or

safety of themselves or others; and (2) whether the manner and scope of the search [or entry] is

reasonable.  *Id*. at 718.  The Tenth Circuit has also authorized warrantless entry into a residence

when officers have a reason to believe that criminal evidence may be destroyed or removed.

*United States v. Cuaron*, 700 F.2d 582, 586 (10th Cir. 1983) (citing *United States v. McEachin*,

670 F.2d 1139, 1144–45 (D.C.Cir. 1981)).  However, where the exigency is based on the fear that evidence will be destroyed, it must be "supported by clearly defined indications of exigency that are not subject to police manipulation or abuse," and is only available for serious crimes.  *Wicks*, 995 F.2d  at 970 (citing *United States v. Carr*, 939 F.2d 1442, 1448 (10th Cir. 1991)) (citation omitted).

Nevertheless, courts have held that "[e]xceptions to the warrant requirement are few in number and carefully delineated, and … the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests."  *McInerney v. King*, 791 F.3d 1224, 1231 (10th Cir. 2015) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984)).  Ultimately, exigent circumstances arise when there is "insufficient time to obtain a warrant."  *United States v. Campbell*, 945 F.2d 713, 715 (4th Cir. 1991).  Furthermore, law enforcement officers may not create or manufacture the exigency in order to justify their warrantless entry into a home.  *Martin*, 613 F.3d at 1304.

## DISCUSSION

In this case, the government does not dispute that Mr. Trammer had standing to challenge the officers' warrantless entry into his motel room.  His motel room is treated as a home would be treated, and accordingly he is afforded the same Fourth Amendment protections.  *See Reeves*, 524 F.3d at 1164–65; *Aguilar*, 2010 WL 11622980 at *3; *Wicks*, 995 F.2d at 969.  As such, he had a reasonable expectation of privacy in the room.  Accordingly, the question is whether both probable cause and exigent circumstances exited such that the warrantless entry into Mr. Trammer's motel room in order to arrest him was reasonable and justified.  *See Reeves*, 524 F.3d at 1169.

I.      **Probable Cause**

The government argues that probable cause did not arise until the moment that law enforcement knocked on the motel room door and located Mr. Trammer inside. Doc. 76 at 9. The government believes that prior to that moment, there was only reasonable suspicion. *Id*. The government argues that while the ISU was charged with locating the individuals suspected of the Sprint store robbery, they did not have the "express purpose of arresting them." *Id*. at 11. It contends that the officers were gathering and being provided more information throughout the day, but at the time that Ms. Bowles indicated that TC was in room 164, they still had insufficient probable cause and their "only choice" was to execute a "knock-and-talk" at the room. *Id*. at 12–13. The government asserts that the tip, consistent physical descriptions, and security videos, at best, provided reasonable suspicion. *Id*. at 13. It is the government's position that by the time Detective Myers had collected enough information through her investigation to obtain an arrest warrant for Mr. Trammer, ISU had already apprehended him. *Id*. It maintains that probable cause was not established until the officers knocked on the hotel room door and found a suspect inside. *Id*. at 14–15.

Defense counsel, on the other hand, argues that Detective Myers had probable cause on November 17, 2015 at which time she was already investigating the robberies of three cell phone stores, and then received a tip naming Mr. Perine and Mr. Trammer as the offenders. Doc. 77 at 6. At that time, she was able to compare their photographs to surveillance videos and descriptions of the offenders. *Id*. Defense counsel argues that the fact that Detective Myers knew she had probable cause at that point is evidenced by the fact that she contacted ISU in order to brief them, prior to the occurrence of Sprint store robbery. *Id*. He argues that at the absolute latest, probable

cause arose around noon on November 18, 2015 at which time Detective Myers was present when a victim of the Sprint store robbery identified Mr. Perine as one of the offenders. *Id*. at 6–7. He argues that Detective Myers belief that probable cause existed at that time is again evidenced by the fact that shortly thereafter, she tasked ISU officers with arresting Mr. Trammer. *Id*. at 7.

"Probable cause exists when under the totality of the circumstances there is a reasonable probability that a crime is being committed." *Traxler*, 477 F.3d at 1247. No single factor is determinative and the circumstances should be viewed in their totality rather than individually. *Id*. (citation omitted). Probable cause exists where the arresting officer has knowledge of "reasonably trustworthy information" which is "sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995) (quoting *Jones v. City and County of Denver*, 854 F.2d 1206, 1210 (10th Cir. 1988)). Here, Detective Myers was able to corroborate the anonymous tip by using various investigative databases to compare photographs of Mr. Trammer to the surveillance videos as well as descriptions of the suspect. Therefore, she was not, as government suggests, relying on a "single unverified tip." Doc. 76 at 13. Furthermore, Detective Endzel testified that at the time Detective Myers tasked ISU with the apprehension of Mr. Trammer, he was under the impression that there was probable cause to make an arrest. Tr. at 69.

Certainly, sufficient probable cause arose the day of the Sprint store robbery through the officers' investigation in the field. Other courts have determined that "[a] combination of tips from an informant and first-hand corroborative observation of suspicious activity will provide probable cause for an arrest." *United States v. McCraw*, 920 F.2d 224, 227 (4th Cir. 1990). Here, the officers were aware that one suspect had fired a shot into the backside of the other during the commission of the Sprint store robbery that morning. They eventually apprehended a man

matching the description of the second suspect with an apparent gunshot wound in his backside, only a short distance from where they ultimately located Mr. Trammer.  He was positively identified as one of the offenders by one of the victims of the robbery.  Furthermore, information provided by Mr. Allen directed the detectives to Mr. Trammer's location and also indicated that he had been involved in the Sprint store robbery earlier that day.  Officers were able to locate the Chevrolet HHR, and based on activity at the Amberly Suites, focus in on room 164.

At that point, law enforcement had Mr. Trammer's name, nickname, photographs, physical description, surveillance videos, statements implicating him in the Sprint store robbery, the apprehension of the second offender at a nearby location including a field identification by one of the victims, and the name and room number of the motel in which they expected they might find him.  Furthermore, ISU had already been tasked with his apprehension.  The Court rejects the government's contention that probable cause did not arise until officers approached room 164 and positively identified Mr. Trammer on the bed inside the room.  Probable cause is "naturally based on probabilities, and a finding of probable cause 'does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime.'"  *United States v. Funches*, 372 F.3d 582, 586 (7th Cir. 2003) (quoting *United States v. Carrillo*, 269 F.3d 761, 766 (7th Cir. 2003)).  Accordingly, the Court finds that detectives had probable cause to arrest Mr. Trammer by the afternoon of November 18, 2015, several hours prior to his arrest in the room at approximately 8:00 p.m.

With probable cause to believe that an individual has committed an offense, law enforcement may apply for an arrest warrant from a magistrate which "serves to protect an individual from an unreasonable seizure."  *Steagald v. United States*, 451 U.S. 204, 213 (1981).

## II.    Exigent Circumstances

Having found that probable cause existed to arrest Mr. Trammer, the question is whether there were exigent circumstances that would justify the officers' warrantless entry into his motel room.

The government makes two main arguments.  The first falls under the safety exception. The government argues that the officers were collecting information through their investigation in the field and could not predict at what point or where they would locate Mr. Trammer.  Doc. 76 at 16.  To that end, it argues that officers knew that there was a chance that Mr. Trammer was armed given that the robbery suspects from the earlier robbery were armed.  *Id*.  Furthermore, they testified that after Mr. Trammer was identified, his hands were hidden under a blanket and he was not compliant with their commands.  *Id*.  The government argues that these facts created an exigency that required the officers to enter the room and apprehend Mr. Trammer based on their concern for their safety.  *Id*. at 17.  The government further argues that the officers initiated a valid "knock-and-talk" which does not contravene the Fourth Amendment.  *Id*. at 18.  The government next argues that there is no Fourth Amendment protection for something visible to the public when the door is voluntarily opened.  *Id*. at 19.  The government's second main argument is that the officers had to act quickly to prevent the loss or destruction of evidence that may have occurred had they waited for a warrant.  *Id*. at 21.

Defense counsel argues that the overarching theme of exigency is the need for immediacy, and at least eight hours had elapsed between the time that probable cause had come into existence and ISU's arrest of Mr. Trammer.  Doc. 77 at 7.  He argues that officers did not need to know Mr. Trammer's exact physical location before they could obtain an arrest warrant, and the latest that

officers should have attempted to obtain an arrest warrant was somewhere between 4:00 and 5:00 p.m. when they were surveilling the Amberly Suites. *Id*. at 8. Accordingly, the hot pursuit exception is not applicable because that is "reserved for situations where speed is essential to protect a compelling governmental interest." *Id*. (quoting *United States v. Morgan*, 743 F.2d 1158, 1162 (6th Cir. 1984)). He also argues that officers may not create an exigency that did not otherwise exist. *Id*. at 8–9. Because Mr. Trammer was not previously aware of the presence of law enforcement and his room was under constant surveillance, defense counsel contends that there was no reasonable concern about the risk of imminent destruction of evidence or of a threat to officer safety or safety of the public. *Id*. at 9.

Exigent circumstances may permit warrantless entry into the home where there is insufficient time to procure a warrant and one of the specific exceptions arises. *See Martin*, 613 F.3d at 1299; *Campbell*, 945 F.2d at 715. With respect to the safety exigency, the government argues that the facts of this case are nearly identical to those in *United States v. Martin*, 613 F.3d 1295. However, the facts in *Martin* can easily be distinguished from the instant case. There, the court looked at the first factor for determining the existence of an exigency based on safety concerns: whether the officers had an objectively reasonable basis to believe that there was an immediate need to enter to protect their own safety. *Id*. at 1303. Similar to this case, when the officers approached the front door, they came face to face with a man who had likely shot someone else earlier in the day. *Id*. at 1304. However, in that case the officers were at the suspect's girlfriend's apartment building in hopes of getting a statement and information from her. *Id*. at 1298. At that point, they were not tracking leads pointing to the suspect's actual location as they were in this case.

Furthermore, although in both cases the officers believed the suspect had shot someone earlier in the day, in *Martin*, the suspect defied officer orders to put his hands on the wall and instead dropped his hands out of sight and stated "[I] ha[ve] something on [me]." *Id*. Here, on the other hand, officers had no such confirmation that Mr. Trammer was armed at the time they located him in the motel room and, despite claims that he failed to comply with orders, there was conflicting testimony that he was asleep at the time they arrived at the room. It cannot be said here, as in *Martin*, that it was "a reasonable alternative for the officers to believe that they needed to enter the building immediately to disarm" Mr. Trammer for their safety and the safety of others, because they had no indication that he was armed at that time. *Id*. at 1304; *see also Thomas v. Vaughn*, No. 2:93CV925 PGC, 2006 WL 2375657, at *6 (D. Utah Aug. 11, 2006), *aff'd*, 250 F.App'x 832 (10th Cir. 2007) (the fact that a weapon was used in an earlier robbery alone, absent other circumstances showing an immediate threat to the officers or others, did not justify officers' immediate warrantless entry into the apartment).

With respect to the second factor, whether the conduct of the entry was reasonable, the *Martin* court found that it was given that the entry was "extremely modest." *Id*. There, the officers proceeded only a short distance through an open door into a common area to execute the arrest, and neither forced their way in nor drew their weapons. *Id*. Here, on the other hand, Ms. Salazar testified that the officers' weapons were drawn at the time the door was opened, and that once they identified Mr. Trammer, they forced their way into the private room, not a common area. The *Martin* court noted that there was no evidence that the officers knew that Mr. Martin would be present at the apartment when they arrived. *Id*. at 1305. On the contrary here, although the officers could not be 100 percent certain, they approached room 164 because they believed they would find Mr. Trammer there. Accordingly, the comparison to *Martin* is misplaced.

16

The Court also notes that manufactured exigencies, or exigent circumstances created by law enforcement, do not justify the warrantless intrusion into a home or area protected by the Fourth Amendment. *See Martin*, 613 F.3d at 1304 ("law enforcement officers may not 'create' the exigency justifying their intrusion into a home") (citation omitted); *Kentucky v. King*, 563 U.S. 452, 462 (2011) (Exigent circumstances justify a warrantless search when the police conduct preceding the exigency is reasonable. If the police "did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable."). Specifically, officers are not permitted to create exigent circumstances by revealing their presence to suspects who would respond by destroying evidence or endangering the police. *United States v. Newman*, 472 F.3d 233, 238 (5th Cir. 2006). The Tenth Circuit, based on its reading of relevant Supreme Court cases, has directed that in cases where the police fear the destruction of evidence, warrantless entry based on exigent circumstances should be "limited in scope to the minimum intrusion necessary to prevent the destruction of evidence" and "supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse." *United States v. Aquino*, 836 F.2d 1268, 1272 (10th Cir. 1988).

The government argues that the evidence could have been destroyed and Mr. Trammer could have evaded law enforcement and avoided arrest had the detectives waited for a warrant. Doc. 76 at 21. However, as defense counsel points out, there was no indication that Mr. Trammer was aware of any police presence outside of his motel room. The door to this motel room was under constant surveillance for several hours prior to Mr. Trammer's arrest, and there is no evidence that there were any alternate exits from the room. Unlike drugs which can easily be disposed of by flushing them down the toilet, stolen cell phones or electronics cannot be destroyed or disposed of inside a motel room.

Furthermore, Detective Endzel testified that they had been surveilling Mr. Trammer's room for at least three hours prior to making contact with any individuals at the Amberly Suites. Nevertheless, no effort was made on the part of any investigating officers, including Detective Myers and the ISU team on site, to obtain a warrant for Mr. Trammer's arrest. In *United States v. Patino*, the Seventh Circuit questioned why a telephonic search warrant was not sought during a thirty-minute period that the agent on site waited for backup to arrive. 830 F.2d at 1416. The court noted that even if the process took longer than thirty minutes, there was no indication that the suspect was aware that he had been found, and the agents could have "discreetly watched the exits while they awaited the telephonic search warrant." *Id*. Similarly here, the detectives surveilled Mr. Trammer's room for hours and had ample time to procure a search warrant, either in person or by telephone. The officers could have "discreetly watched" the door to Mr. Trammer's room as they awaited the warrant. The *Patino* court also noted that law enforcement may not "deliberately wait for exigent circumstances to arise and then exploit the exception to justify warrantless entry." *Id*. at 1417 (quoting *United States v. Dowell*, 724 F.2d 599, 602 (7th Cir. 1984). In the instant case, there was no indication that Mr. Trammer suspected that there was a police presence outside of his room, perhaps until the officers contacted Ms. Bowles outside.

Courts have previously held that even where a warrant is required, police are under no obligation to obtain one "simply because probable cause has been established." *United States v. Hall*, 500 F.App'x 820, 820 (11th Cir. 2012) (citing *Kentucky v. King*, 563 U.S. 452, 469 (2011)). Even where a warrant is required, police instead may opt to seek consent rather than procuring a warrant. *Id*. at 820–21. However, as the Tenth Circuit has stated, "police should begin the process of obtaining a warrant at the earliest prudent moment." *Aquino*, 836 F.2d at 1272 (citation omitted). Along similar lines, the *Patino* court found that the police had "ample opportunity to

seek a search warrant," and any exigency in that situation was created by their failure to do so. *Id*. *See also Morgan*, 743 F.2d at 1161 (upholding the district courts finding that there were no exigent circumstances because no effort was made to obtain a warrant in a one- to two-hour period). Furthermore, the Tenth Circuit has stressed that "when a telephone warrant procedure is available, police must exploit it," and that "courts should consider the amount of time required to obtain a telephone warrant in assessing the urgency of the situation." *Aquino*, 836 F.2d at 1272; *Cuaron*, 700 F.2d at 589 (citing *McEachin*, 670 F.2d at 1146. The testimony at the hearing indicated that there was a three-hour period during which there was no significant activity, yet no effort was made to obtain an arrest warrant, either by telephone or in person, despite the fact that multiple officers were participating in the surveillance.

With respect to the government's assertion that the officers conducted a valid "knock-and-talk," the Court does not find sufficient evidence that the interaction was a valid, consensual knock-and-talk based on potentially conflicting testimony. A knock-and-talk is a consensual encounter that does not implicate the Fourth Amendment. *United States v. Cruz-Mendez*, 467 F.3d 1260, 1264 (10th Cir. 2006). Courts have recognized knock-and-talks as "reasonable investigative tool[s] when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity." *Id*. at 1265 (quoting *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001)). In *United States v. Newman*, the court found that because the officers employed a legitimate investigative approach through the knock-and-talk where they intended to ask the residents questions about a suspect, they did not manufacture an exigency. 472 F.3d at 239. In this case, however, Ms. Salazar testified that at the time the officers knocked, they already had their weapons drawn, indicating that they were not merely seeking to gather information.

Consent given during a knock-and-talk is "valid only if it is freely and voluntarily given." *Cruz-Mendez*, 467 F.3d at 1265 (quoting *United States v. Sawyer*, 441 F.3d 890, 894 (10th Cir. 2006)).  If the officers brandished weapons at the time they approached the motel room, consent would not have been freely and voluntarily given.  Furthermore, there is no evidence of consent to enter the room at all.  Ms. Salazar testified that as soon as the other individual opened the door, the officers forced their way into the room.  Furthermore, Detective Endzel testified that he positively identified Mr. Trammer who allegedly concealed his hands, at which time he entered the room to make the arrest.  It does not appear that he waited for any form of consent prior to entering the room.  The Court does not find that this "knock-and-talk" was a valid or justified investigative tool under these circumstances, particularly given that law enforcement had probable cause for several hours at that point, had made no effort to secure an arrest warrant, and possibly conducted the "knock-and-talk" with weapons drawn.

Finally, the Court does not find merit in the government's assertion that Fourth Amendment protections are not implicated for anything or anyone visible inside a dwelling if the door is voluntarily opened.  *See* Doc. 76 at 19.

The Court does not find that any of the traditional exigent circumstances exceptions to the warrant requirement applied in this case.  Accordingly, the Court finds that the warrantless entry into Mr. Trammer's motel room to conduct the arrest was not justified and was a violation of his Fourth Amendment right to be free from unreasonable searches and seizures.

### III.    Fruit of the Poisonous Tree Doctrine

Defense counsel argues that because there were no exigent circumstances, the warrantless entry into the motel room and resulting arrest were unlawful and, as such, all evidence seized from Mr. Trammer's person subsequent to the arrest should be suppressed under the fruit of the

poisonous tree doctrine. Doc. 48 at 5; Doc. 77 at 9. Generally, evidence obtained as a result of an unlawful, warrantless arrest should be suppressed if the link between the unlawful arrest and the evidence is not too attenuated. *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1040–41 (1984) (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)). Under the attenuation doctrine, evidence is admissible if it is sufficiently remote from law enforcement's unlawful conduct:

> "Evidence is admissible when the connection between the unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained."

*Utah v. Strieff*, 136 S.Ct. 2056, 2061 (2016). In this case, defense counsel argues that there is no attenuation between the arrest and the seizure of physical evidence from Mr. Trammer's person. Doc. 48 at 6. There is no remoteness or attenuation between the unlawful police conduct—the warrantless entry into Mr. Trammer's motel room to arrest him—and the evidence seized from Mr. Trammer's person incident to the arrest. Accordingly, the Court finds that this evidence should be suppressed.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant Adrian Trammer's Motion to Suppress Evidence Seized as a Result of His Unlawful Arrest [Doc.48].

Dated this 11th day of April, 2019.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE


Todd A. Coberly                              Presiliano Torrez, Timothy Trembley
*Attorney for Mr. Trammer*                   *Assistant United States Attorneys*